## NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2023 CA 1236

JASON JONES AND STEPHANIE JONES, INDIVIDUALLY AND
O/B/O CALEB JONES

VERSUS

STATE OF LOUISIANA, THROUGH DEPARTMENT OF
TRANSPORTATION AND DEVELOPMENT, ET AL

Judgment Rendered: __NOV 0 4 2024__

* * * * *

On Appeal from the
Eighteenth Judicial District Court
In and for the Parish of West Baton Rouge
State of Louisiana
No. 1043264, Div. D

The Honorable Elizabeth A. Engolio, Judge Presiding

* * * * *

| | |
|---|---|
| Marcus J. Plaisance<br>Mark D. Plaisance<br>Prairieville, Louisiana | Attorneys for Plaintiffs/Appellants<br>Jason Jones and Stephanie Jones,<br>Individually and o/b/o Caleb Jones |
| Liz Murrill<br>Attorney General<br>Christopher W. Stidham<br>Special Assistant Attorney General<br>Breann Crane<br>Baton Rouge, Louisiana | Attorneys for Defendant/Appellee<br>State of Louisiana, through the<br>Department of<br>Transportation and Development |

* * * * *

**BEFORE: PENZATO, WOLFE, AND STROMBERG, JJ.**

**STROMBERG, J.**

In this appeal of a suit involving a motor vehicle accident, the plaintiffs contend that the district court erred in granting the motion for judgment notwithstanding the verdict ("JNOV") filed by the defendant, the State of Louisiana, through the Department of Transportation and Development ("DOTD"), and setting aside that part of the jury's verdict assessing fault to DOTD. The plaintiffs also contend that the jury erred in assessing a percentage of fault to the plaintiff driver and that the jury should have apportioned fault equally between DOTD and the other driver involved in the accident. Finding that the district court erred in granting the motion for JNOV, we reverse that judgment and reinstate the judgment signed in accordance with the jury verdict, thereby affirming that judgment.

## FACTS AND PROCEDURAL HISTORY

On Sunday, January 24, 2016, at about 9:53 a.m., the plaintiff, Jason Jones ("Mr. Jones"), was driving a 2015 Volkswagen Passat rental car ("Mr. Jones' car") in the left, inside lane of the Louisiana Highway 1 ("LA-1") service road leading to the entrance ramp for Interstate 10 East in Port Allen in West Baton Rouge Parish. This portion of the road is a two-lane, one-way road.[1] Mr. Jones' wife, Stephanie ("Mrs. Jones"), was seated in the front passenger seat, and their two children were seated in the rear of the vehicle.

At the same time, Malcolm G. Myer ("Mr. Myer"), was driving a tan 2007 Toyota 4-Runner ("Mr. Myer's SUV") on the same road in the same direction in the right, outside lane. What happened next is disputed. The Joneses alleged that Mr. Myer's SUV crossed the center line and entered their lane of travel, forcing

_____

[1] "Roadway" is defined as "that portion of a highway improved, designed or ordinarily used for vehicular traffic, exclusive of the berm or shoulder." La. R.S. 48:1(18). For convenience and consistency, we will refer to the roadway in this case as "the road." Some of the testimony refers to the road in this case as a ramp. "Shoulder" is defined as "the portion of the highway contiguous with the roadway for accomodation for stopped vehicles, for emergency use and for lateral support of base and surface." La. R.S. 48:1(21).

their car off the road to avoid a potential collision. Mr. Myer, however, asserted that he changed lanes into the left lane and that Mr. Jones' car ran off the road for unknown reasons. An eyewitness to the accident, Dewey Frederic, Jr., testified at the trial that he believed Mr. Myer was trying to run Mr. Jones' car off the road and that "[r]oad rage" was involved.

After Mr. Jones' car left the road, it traveled approximately 213 feet on the grassy median and the left shoulder before striking a guardrail. The left shoulder was designed and constructed as an asphalt shoulder, but at the time of the accident it was covered with grass, clover, and dirt. When the driver's side of Mr. Jones' car struck the guardrail, the Joneses' son, Caleb, who was seated on the driver's side in the rear, sustained severe injuries, including the amputation of his left arm above the elbow and major injuries to his left leg.

Mr. and Mrs. Jones (collectively referred to as "the Joneses"), individually and on behalf of Caleb, filed suit against DOTD on October 31, 2016.[2] In their petition, the Joneses alleged that Caleb's injuries were caused, in whole or in part, by the negligence and/or fault of DOTD, alleging that DOTD improperly maintained the shoulder and that it knew or should have known of the shoulder's dangerous condition. They also alleged that DOTD was strictly liable as it was responsible for the care, custody, and control of the shoulder. The Joneses claimed that because the paved left shoulder was covered in grass and dirt due to DOTD's failure to properly maintain it, Mr. Jones could not avoid hitting the guardrail with the car.[3]

---

[2] The Joneses also named as defendants Mr. Myer and his insurer, Progressive Security Insurance Company ("Progressive"), and their uninsured/underinsured motorists insurer, Republic Fire and Casualty Insurance Company ("Republic"). They later amended their petition to add the City of Port Allen as an additional defendant.

[3] In February of 2021, DOTD filed a motion for summary judgment, which the district court denied in a judgment signed on May 28, 2021. DOTD sought supervisory writs in this court, which granted the writ and remanded the matter for the district court to consider the objections raised as to evidence. **Jones v. State through Department of Transportation and Development**, 2021-0342 (La. App. 1 Cir. 5/24/21), 2021 WL 2080053 (unpublished writ

3

This matter proceeded to a seven-day jury trial ending in September of 2022 that only concerned Caleb's claims.[4] At the conclusion of the trial, the jury answered interrogatories finding that, at the site of the accident, the road had a defect that created an unreasonable risk of harm and that defect was a cause-in-fact of the accident; that DOTD had actual or constructive notice of the defect and had reasonable time to correct the defect but failed to do so; and that both Mr. Jones and Mr. Myer were negligent in the operation of their respective vehicles and DOTD was 20% at fault and Mr. Jones and Mr. Myer were each 40% at fault. The jury awarded damages to Caleb totaling $20,000,000.00.[5] On December 12, 2022, the district court signed a judgment in accordance with the jury verdict, but it reduced the award for past medical expenses and the total aggregate award for general damages.[6]

DOTD filed a motion for JNOV, which the district court granted in a judgment signed on March 13, 2023, dismissing all claims against DOTD and

---

action). On remand, the district court denied DOTD's motion for summary judgment after making evidentiary rulings, and DOTD again filed a supervisory writ application. This court denied the writ, as did the Louisiana Supreme Court. **Jones v. State through Department of Transportation and Development**, 2021-1095 (La. App. 1 Cir. 12/16/21), 2021 WL 5937436 (unpublished writ action), writ denied, 2022-00116 (La. 2/22/22), 333 So.3d 448.

[4] Prior to trial, other claims against DOTD and against certain other defendants were resolved. On April 20, 2017, the district court signed a judgment of partial dismissal, dismissing the Joneses' claims against Progressive and Mr. Myer to the extent he was insured by Progressive. On November 20, 2018, the district court signed a judgment dismissing the Joneses' claims against Republic. On August 16, 2022, the district court signed a judgment of voluntary partial dismissal, dismissing all individual claims brought by the Joneses and reserving all claims brought by them on behalf of Caleb.

[5] At the close of the Joneses' presentation of their evidence, the City of Port Allen filed a motion for involuntary dismissal, which the district court granted. A judgment was signed in accordance with the ruling on March 27, 2023. DOTD also filed a motion for directed verdict, which the district court denied.

[6] The $20,000,000.00 damages award was reduced in part when the total award for past medical expenses was reduced from $3,000,000.00 to $1,971,477.27 pursuant to a stipulation by the parties and the evidence presented at trial; the total aggregate award for general damages was reduced to the statutory cap of $500,000.00 pursuant to La. R.S. 13:5106. Therefore, judgment was rendered in favor of the Joneses on behalf of Caleb and against DOTD in the amount of $894,295.45 plus legal interest and court costs. The district court also awarded Caleb future medical care and related benefits at the expense of DOTD, which were capped at $600,000.00, payable through the Future Medical Care Fund pursuant to La. R.S. 39:1533.2 and La. R.S. 13:5106(B)(3)(c).

taxing the Joneses with all court costs. The Joneses appeal from both the judgment granting the motion for JNOV and the judgment signed in accordance with the jury verdict. On appeal the Joneses contend that the district court erred in granting the motion for JNOV, and, if this court finds the district court erred in granting the motion for JNOV and reinstates the jury verdict, that the jury erred in apportioning fault to Mr. Jones.

## DISCUSSION

### *JNOV*

The Louisiana Supreme Court recently expounded on the important role of juries in **Eastman v. State Farm Mutual Automobile Insurance Co.**, 2023-01107 (La. 5/10/24), 384 So.3d 865, 872-73. The court noted that confidence in juries, and their ability to handle and decide difficult, factual questions, was reflected in the legislature's recent amendments to the Louisiana Code of Civil Procedure. **Eastman**, 384 So.3d at 872. When there is a jury, the jury is the trier of fact. **Eastman**, 384 So.3d at 872. Juries are held in high regard and great deference is accorded to their decisions. **Eastman**, 384 So.3d at 872. This deference recognizes that the right to a jury is statutorily protected. See La. C.C.P. arts. 1731(A), 1736. Thus, overturning a jury's verdict that is reasonably supported by the record is, in essence, the denial of the parties' right to be heard and judged by the jury. **Eastman**, 384 So.3d at 872.

Louisiana Code of Civil Procedure article 1811 provides the rules which govern a JNOV. Although La. C.C.P. art. 1811 does not prescribe the specific standard for a district court to follow in deciding whether to grant or deny a motion for JNOV, the Louisiana Supreme Court has provided direction as follows:

> [A] JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could

5

not reach different conclusions, not merely when there is a preponderance of evidence for the mover. The motion should be denied if there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions.

**Eastman**, 384 So.3d at 872 (quoting **Joseph v. Broussard Rice Mill, Inc.**, 2000-00628 (La. 10/30/00), 772 So.2d 94, 99).

A motion for JNOV raises the question of whether the jury verdict is supported by any legitimate or substantial evidence. **Eastman**, 384 So.3d at 872. In deciding a motion for JNOV, the district court does not have the discretion to weigh evidence, evaluate the credibility of witnesses, or to substitute its judgment for that of the jury. **Eastman**, 384 So.3d at 872. A district court's authority to grant a motion for JNOV under La. C.C.P. art. 1811 is limited by the jurisprudence to those cases where the jury's verdict is absolutely unsupported by any competent evidence. **Eastman**, 384 So.3d at 872-73.

### *LIABILITY*

In determining whether liability exists under a duty-risk analysis, a plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, that the defendant owed a duty to the plaintiff which the defendant breached, and that the risk of harm was within the scope of protection afforded by the duty breached. **Johnson v. State Through Department of Transportation and Development**, 2017-0973 (La. App. 1 Cir. 4/3/19), 275 So.3d 879, 892, writ denied, 2019-00676 (La. 9/6/19), 278 So.3d 970. Regarding DOTD's liability, the pertinent legal principles are somewhat different insofar as tort claims may be pursued against the public entity in strict liability pursuant to La. C.C. art. 2317 and La. R.S. 9:2800, as well as in negligence pursuant to La. C.C. art. 2315. **Johnson**, 275 So.3d at 892. Under both theories, the plaintiff bears the burden of showing that: (1) DOTD had custody of the thing that caused the plaintiff's injuries or damages; (2) the thing was defective because it had a condition that created an

6

unreasonable risk of harm; (3) DOTD had actual or constructive knowledge of the defect and did not take corrective measures within a reasonable time; and (4) the defect in the thing was a cause-in-fact of the plaintiff's injuries. **Johnson**, 275 So.3d at 892.

Louisiana law imposes a duty on DOTD to design, construct, and maintain Louisiana's highways. See La. R.S. 48:21(A).[7] More specifically, La. R.S. 48:35(A) requires that DOTD "shall adopt minimum safety guidelines with respect to highway and bridge design, construction, and maintenance." Those guidelines are required to "correlate with and, so far as possible, conform to the system then current as approved by the American Association of State Highway and Transportation Officials [AASHTO]...." La. R.S. 48:35(A). Furthermore, DOTD has "a duty to maintain, repair, construct, or reconstruct any public road, highway, bridge, or street, or any portion thereof, in a manner that is not unreasonably dangerous for a reasonably prudent driver." La. R.S. 48:35(E)(1)(a).

The duty of DOTD is to see that the state highways are reasonably safe and do not present an unreasonable risk of harm to the motoring public exercising ordinary care and reasonable prudence. **Brooks v. State ex rel. Department of Transportation and Development**, 2010-1908 (La. 7/1/11), 74 So.3d 187, 189. DOTD's duty extends to the shoulders of highways. **Brooks**, 74 So.3d at 189. DOTD's duty to maintain safe shoulders encompasses the foreseeable risk that for any number of reasons a motorist might find himself on, or partially on, the shoulder. **Brooks**, 74 So.3d at 189. This duty extends not only to prudent and attentive motorists, but also to those motorists who are slightly exceeding the speed

---

[7] Louisiana Revised Statutes 48:21(A) states: "The functions of the department shall be to study, administer, construct, improve, maintain, repair, and regulate the use of public transportation systems and to perform such other functions with regard to public highways, roads, and other transportation related facilities as may be conferred on the department by applicable law."

limit or are momentarily inattentive, or who inadvertently drive onto the shoulder of the highway. See **Brooks**, 74 So.3d at 189; **Campbell v. Louisiana Department of Transportation and Development**, 94-1052 (La. 1/17/95), 648 So.2d 898, 901. This duty, however, does not render DOTD the guarantor of the safety of all of the motoring public or the insurer for all injuries or damages resulting from any risk posed by obstructions on or defects in the road or its appurtenances. **Brooks**, 74 So.3d at 189. Prudent behavior for a motorist who inadvertently drives off the paved road onto the shoulder is first to reduce speed and then to attempt a gradual reentry after the motorist has regained control of the vehicle. See, e.g., **Hardenstein v. Cook Construction, Inc.**, 96-0829 (La. App. 1 Cir. 2/14/97), 691 So.2d 177, 184, writ denied, 97-0686 (La. 4/25/97), 692 So.2d 1093. Whether DOTD breached its duty, that is, whether the shoulder was in an unreasonably dangerous condition, is a question of fact and will depend on the facts and circumstances of each case. **Brooks**, 74 So.3d at 190.

Whether an unreasonably dangerous condition existed is measured by a "risk-utility" test, which relevant factors are: (1) the utility of the complained-of-condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of social utility or whether it is dangerous by nature. **Johnson**, 275 So.3d at 895.

The fact that more than one party can contribute to the harm is the reason for our comparative fault system. See La. C.C. art. 2323; **Campbell**, 648 So.2d at 902; **McCain v. Howell**, 2006-1830 (La. App. 1 Cir. 9/14/07), 971 So.2d 323, 331-32, writ denied, 2007-2027 (La. 12/14/07), 970 So.2d 533. In apportioning fault, the trier of fact shall consider both the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages claimed. **Campbell**, 648 So.2d at 902. The finding of percentages of fault is a

factual determination. **Rideau v. State Farm Mutual Automobile Insurance Co.,** 2006-0894 (La. App. 1 Cir. 8/29/07), 970 So.2d 564, 574, <u>writ denied</u>, 2007-2228 (La. 1/11/08), 972 So.2d 1168. A trier of fact's allocation of fault will not be disturbed unless it is found to be manifestly erroneous or clearly wrong. **Hebert v. Rapides Parish Police Jury,** 2006-2001 (La. 4/11/07), 974 So.2d 635, 654. The trier of fact is charged with assessing the credibility of the witnesses and, in doing so, is free to accept or reject, in whole or in part, the testimony of any witness. **Johnson,** 275 So.3d at 898.

## *ANALYSIS*

In granting the motion for JNOV, the district court issued reasons with its judgment. The court stated that DOTD's duty to motorists is to provide reasonably safe roads for those exercising ordinary care and for reasonably prudent drivers. The court then found that since the jury allocated 40% fault to both Mr. Jones and Mr. Myer, the jury accepted Mr. Frederic's testimony, "which described a 'road rage' scenario." The district court then stated that DOTD proved by a preponderance of the evidence that it owed no duty to drivers conducting themselves on the highway in the manner described by Mr. Frederic. According to the district court, "It is not legally possible or logically sound to find both that the drivers were significantly at fault and that DOTD owed them a duty." The court then stated that DOTD proved through its experts that the condition of the shoulder was not inherently dangerous, adding that DOTD established that "the asphalt shoulder covered in vegetation for countless years" had not created an unreasonable risk of harm. The court concluded "the conduct of the at-fault drivers outweighs any risk created by the reduction in the coefficient of friction caused by the grass or clover shoulder."[8]

---

[8] The coefficient of friction is the amount of resistance an object will encounter when a force is applied in an attempt to move or slide it.

In determining whether the district court erred in granting the motion for JNOV, as the Joneses contend, our initial inquiry is: did the evidence at trial overwhelmingly support a finding that DOTD was not 20% at fault such that reasonable jurors could not have concluded otherwise? If so, then the district court was correct in granting the motion for JNOV. However, if reasonable jurors in the exercise of impartial judgment might conclude from the evidence that DOTD was 20% at fault, then the district court erred in granting the motion for JNOV. See **Glaser v. Hartford Fire Insurance Co.**, 2022-0534 (La. App. 1 Cir. 8/30/23), 375 So.3d 479, 488, <u>writs denied</u>, 2023-01346, 2023-01314, 2023-01300 (La. 1/10/24), 376 So.3d 130, 134, 136.

At the trial, witnesses testified as to the accident itself and the resulting injuries Caleb sustained and also to the design, condition, and maintenance of the shoulder. The witnesses who testified about the accident included Mr. and Mrs. Jones, Mr. Myer, and the eyewitness, Mr. Frederic, and law enforcement responding to and investigating the accident. The witnesses testifying about the shoulder included DOTD and Port Allen representatives. Expert witnesses testified about how the condition of the shoulder related to the accident.

The area of the road where the accident occurred was a service road south of the intersection of Avenue G and LA-1. To enter the service road, vehicles had to exit LA-1 from the right lane, which split into two twelve-foot wide lanes that fed into an area called 'the gore." The "gore" was defined as markings (such as chevrons) that channeled the traffic either to one direction or the other. At the gore, the photographic evidence showed that the LA-1 service road made a "Y" shape, splitting into two lanes, one going to Plaquemine and the other going to the Port of Baton Rouge and Baton Rouge. The road leading to Baton Rouge then narrowed to one lane for 400 feet, and then widened into the two, twelve-foot wide lanes that made up the ramp. On the ramp, the right lane led to Interstate 10 East

to Baton Rouge and the left lane continued south to the Port of Baton Rouge. The accident occurred when Mr. Jones' car left this two-lane section of the ramp and hit a guardrail. The posted speed limit at the crash site was 55 mph.

Sarah Ballmer, a DOTD design civil engineer, and Joseph Keith Palermo, the designated representative of DOTD on the maintenance of roads and shoulders, including the area where this accident occurred, testified about the road and maintenance of roads and shoulders, including the accident site. According to their testimony, the shoulder, road, and ramp were built in the 1960s and were designed in compliance with the DOTD guidelines and AASHO guidelines then in force.[9] They were constructed as designed, and the shoulder was designed and constructed as an asphalt shoulder. Mr. Palermo testified that he inspected the shoulder after the accident, which was covered by aggregate, grass, soil, sand, and clover that was one and a half inches to two inches deep above the asphalt. Mr. Palermo was asked, "[Y]ou were amazed that there was asphalt underneath the layer of dirt and grass that was at this sight?" and he replied, "Right. I drive that area very, very often, I've been driving it most of my life and ... I thought it was a turf shoulder."[10] Ms. Ballmer admitted that the shoulder was not designed and constructed in that manner.

Mr. Jones testified that his memory of the accident was limited. Mr. Jones further testified that he remembered that, while he was driving on the ramp in the left lane, Mr. Myer's SUV "came over in my lane, I moved to the shoulder and hit my brakes, the car started sliding, [and] we hit the guardrail." Mr. Jones described his car as "uncontrollable" while on the shoulder. When Mr. Jones moved to the shoulder to avoid Mr. Myer's SUV, he testified that he was driving approximately

---

[9] The American Association of State Highway Officials (AASHO) was the organization in existence when the road at issue was designed and constructed and was the predecessor to the American Association of State Highway and Transportation Officials (AASHTO).

[10] One of the responding officers to the accident testified that he was unaware that the shoulder had "pavement under it."

50 mph. Mrs. Jones testified that, before the accident, she was on her phone, and "all of a sudden [Mr. Jones is] like what – what is he doing?" and she saw Mr. Myer's SUV "right next to me." Mrs. Jones explained that Mr. Jones tried to avoid hitting Mr. Myer's SUV and was "pushed off to the side" "on the median" and shoulder.

Mr. Myer testified that he was in the left lane at the red light at the intersection of Avenue G and LA-1. According to Mr. Myer, he accelerated to pass the truck driven by the eyewitness, Mr. Frederic, which was in the right lane, so he could get into that lane to return to his home in Baton Rouge. Mr. Myer stated that he noticed Mr. Jones' car behind him at the red light at the intersection. According to Mr. Myer, he was traveling at 55 mph when he passed Mr. Frederic's truck, which was travelling about 40 to 45 mph.

After passing Mr. Frederic's truck, Mr. Myer testified he changed his mind about going to Baton Rouge and decided to return to Brusly, so he steered into the left lane. According to Mr. Myer, he was in the left lane when he saw Mr. Jones on the grass-covered shoulder and then hitting the guardrail. Mr. Myer confirmed that, in the statement he gave to the investigating officer on the date of the accident, he said that Mr. Jones' car approached him from behind at "a high rate of speed" on his left side, went into the grass, and then hit the guardrail. In the statement, Mr. Myer added that he was "was not racing as indicated by another person," and that Mr. Jones' car passed him "while speeding." However, when asked at trial if he and Mr. Jones were speeding before the accident, Mr. Myer testified that they were not going over the speed limit and repeated that they both sped up in front of Mr. Frederic's truck to pass it.

Mr. Frederic, the eyewitness and the driver of a truck, testified that he was on his way home after work and turned right from Avenue G onto the LA-1 service road and into the right lane. According to Mr. Frederic, he was in "the little

12

rumble strips" or "the little white markers ... with the rocks," which was also described as the gore at trial, when he first noticed Mr. Myer's SUV. Mr. Frederic then stated, "I heard the rocks flying, I looked to my left, I hit the brakes, started slowing down because I knew something was going on. And then that's when I seen [Mr. Jones' car] on the other side of [Mr. Myer's SUV] ... side-by-side...." According to Mr. Frederic, he was driving "maybe 40" mph, but slowed down when he heard "a bunch of debris" hitting his truck. He stated that he saw Mr. Myer's SUV go into Mr. Jones' lane and then saw Mr. Jones' car on the shoulder "sliding" into the guardrail with "[b]urning tires, grass flying out the back." Mr. Frederick testified that he did not see brake lights on Mr. Jones' car after it left the road.

When asked if there was anything that Mr. Jones could have done to avoid the crash at that point, Mr. Frederic testified several times that Mr. Jones should have slowed down when Mr. Myer's SUV "came over." However, Mr. Frederic also admitted to stating that Mr. Jones would have been "better off" staying on the road and hitting Mr. Myer's SUV and additionally, that there was nothing Mr. Jones could have done to avoid what happened.

Mr. Frederic's testimony about Mr. Jones and Mr. Myer's speed was inconsistent. He testified at trial and in a statement given six weeks after the accident that he was going 40 mph and that Mr. Jones and Mr. Myer were going 15 mph faster. He later testified at trial that Mr. Jones and Mr. Myer passed him travelling "60 or 70" mph. However, Mr. Frederic also testified that he "guesstimated" in his statement and in his pretrial deposition. Similarly, when he marked where Mr. Jones' car went off the road on an exhibit, he said he was "[j]ust guessing."

Mr. Frederic was the only person present when the accident occurred who speculated that Mr. Myer was attempting to run Mr. Jones off of the road to "get

13

back" at Mr. Jones "for some reason" and that road rage was a factor. However, he also added, "I have no idea" as to what Mr. Myer was attempting to do. Mr. Frederic replied negatively when asked, "You didn't see them hollering at each other, or giving each other the finger, or shaking their fist out the window or anything like that, did you?" Mr. Frederic's statement he gave to law enforcement on the day of the accident did not mention road rage or racing.

Mr. and Mrs. Jones and Mr. Myer were asked about any signs of road rage. When asked if there was "road rage" between Mr. Jones and himself, Mr. Myer denied it, confirming that there was no argument at the red light, nothing occurred at the intersection, and he had no conversation with Mr. Jones. Mr. Jones testified he had not noticed or had any interaction with Mr. Myer's SUV before it came into his lane. Similarly, Mrs. Jones testified that there was no prior interaction with Mr. Myer or his SUV before it entered their lane.

Lieutenant Casey Williams of the Port Allen City Police Department and Lieutenant Carl Jarrett with the West Baton Rouge Sheriff's Office responded to the accident. They testified that they performed no investigation of the accident because Mr. Jones was an employee of the Port Allen City Police Department. Lieutenants Williams and Jarrett did not witness the accident or have firsthand knowledge of how it occurred, and they were not trained accident reconstructionists.[11] The State Police were contacted to investigate the crash.

---

[11] When Lt. Williams was asked by counsel about his impression of what had occurred in the crash, based on the scene and "things that [he] understood from [his] co-worker," he replied, "possibly road rage," in that "supposedly [Mr.] Myer may have r[u]n [Mr. Jones] off the road." However, Lt. Williams had no personal knowledge about either Mr. Jones' or Mr. Myer's movements on the road.

According to Lt. Jarrett, he spoke to Lt. Williams, who told him an eyewitness' statement to an officer named Nolan Dehon indicated that Mr. Myer and Mr. Jones were drag racing from the stoplight at the intersection. While Lt. Jarrett testified he walked back to the gore and later the stoplight, where he saw tire impressions and "pushed down clovers" in or near the gore that were consistent with what he had heard, he replied affirmatively when asked by counsel if he was "just speculating." When asked by counsel if he had spoken to the eyewitness or Trooper Patin, he replied that he had not. Counsel pointed to the photograph and said there were tire tracks "all over the place."

14

Louisiana State Trooper Jake Patin, the investigating officer on the scene after the accident, testified that he estimated Mr. Jones' speed to be approximately 50 mph at the point of impact and faster than 50 mph when he left the road; however, he later testified that he would be speculating to estimate Mr. Jones' speed when he went off of the road. Trooper Patin testified that he was not able to determine if Mr. Jones had braked. According to Trooper Patin, Mr. Jones said immediately before the crash occurred, he was attempting to pass Mr. Myer's SUV, which began to enter his lane as he entered the left lane where the road changed from one lane to two lanes. Trooper Patin testified that Mr. Jones told him that he and Mr. Myer made eye contact before Mr. Myer came into his lane. Upon questioning by counsel as to whether he had received information from Mr. Frederic, the eyewitness, that "something was going on between Mr. Myer and Mr. Jones" preceding the crash, Trooper Patin replied affirmatively. Trooper Patin gave Mr. Myer a ticket for improper lane usage because he crossed the centerline in front of Mr. Jones' path, which caused Mr. Jones to run off the road, and he did not give Mr. Jones a speeding ticket.[12] Trooper Patin was asked about the shoulder at the scene of the accident, and he testified, "It was covered in grass. … I didn't even know there was a shoulder there."

Mr. Palermo, DOTD's designated representative on maintenance in the area of the accident site, testified that the state owned the crash site and was in charge of maintaining it. He testified that thousands of vehicles had travelled the road for over twenty years, and it had been in the condition it was in when the accident occurred for a number of years. Mr. Palermo said that he had never had a complaint about that shoulder and that there had never been an incident where someone ran into the guardrail. When he was asked about why he considered this shoulder to be "good," he replied that the shoulder structure was stable or hard;

---

[12] Mr. Myer testified that the ticket was later dismissed.

there were no edge ruts or potholes; it did not cause water to "hold in the roadway"; and the grass and clover buildup on top of the paved surface was not causing a problem. Mr. Palermo testified that since the crash, he had done nothing to fix the shoulder "because I don't see anything wrong with it."

Mr. Palermo admitted he was aware that under AASHTO standards, the shoulder was supposed to be maintained as designed and constructed. Mr. Palermo stated that DOTD maintained everything according to the Maintenance Manual. Mr. Palermo was also asked about Section 7.04 of the Maintenance Manual, which said that with paved shoulders, any problems encountered would be "practically the same as those found in maintaining similar road surfaces. Paved shoulders should receive the same maintenance as prescribed for rigid [concrete or cement] or flexible [asphalt] pavements." When asked if there was anything in the Maintenance Manual that allowed DOTD to leave excess materials or to disregard blading issues if the shoulder was draining, Mr. Palermo could not find any such provision in the manual.[13] Counsel also asked Mr. Palermo, "It would be needlessly endangering the motoring public if you didn't preserve the safest possible as-designed shoulder?" to which Mr. Palermo replied, "Yes."

Mr. Palermo testified that if he saw the shoulder and thought it needed maintenance, he would contact the maintenance department to send equipment and manpower to fix it. Mr. Palermo testified that the DOTD superintendent drove around the roads (about 150 miles) every two weeks to inspect them to see if maintenance was needed. Mr. Palermo agreed that when there was excess material on the shoulder, DOTD would "cut or blade" the shoulders. He testified that a

---

[13] While the shoulder in this case was not a turf shoulder, it in essence had become one from the buildup of grass, clover, and soil on top of the asphalt. In the provisions of the Maintenance Manual covering turf shoulders, the Manual noted that turf shoulders tended to build up from vegetation and material for filling ruts, and it would be "necessary to blade the excess material off with the motor grader." The Manual also stated that aggregate shoulders provide "better ride ability" than those of sod.

motor grader would be used to blade it and the material would probably have to be pulled into the road, then picked up and hauled off. He testified DOTD had a motor grader in the yard near the crash site. Mr. Palermo said they would need a truck to haul the material off; a backhoe or bobcat to use to load the material into the truck; some shovels; and some flaggers. He thought the work would take four hours or half a day if everything went right. Mr. Palermo estimated the cost of the work would be from $1,600.00 to $1,700.00.

Another witness regarding the maintenance of the shoulder was Bruce Bass, the streets and drainage supervisor for the City of Port Allen. Mr. Bass testified that DOTD contracted with the City of Port Allen to mow the shoulders and pick up litter. He confirmed that it was not the City of Port Allen's role to inspect the shoulders and that DOTD was responsible for their maintenance. Mr. Bass testified that this road area was "probably one of the worst spots in the city" and it was "dangerous" for mowing.

Several expert witnesses testified at the trial as to the effect, if any, the grass, dirt, and clover covering the asphalt on the shoulder had on Mr. Jones' car. Kelly Adamson, the Joneses' accident reconstruction expert with a specialty in human factors, testified that Mr. Jones' speed range was between 50 and 55 mph when he left the road and when he hit the guardrail. According to Mr. Adamson, when Mr. Myer's SUV came into Mr. Jones' lane, Mr. Jones chose to steer off the road to the left.[14] Mr. Adamson based his conclusion on a study conducted by Dr. Jeffrey Muttart entitled, "Factors that Influence Drivers' Response Choice Decisions in Video Recorded Crashes," which concluded that drivers dealt with an emergency similar to this incident by steering, braking, or steering and braking.

---

[14] Mr. Adamson testified that based on the physical and corroborating evidence, he believed that Mr. Jones steered first, which was shown by the curved tire path and the yaw marks on the slick surface.

17

Mr. Adamson testified that based on the simulation he performed in this case to reconstruct the path of travel and what it would take to steer the vehicle, he concluded that if the accident were recreated where the shoulder was asphalt instead of grass and clover, Mr. Jones' car's path would clear the guardrail. To perform the simulation, Mr. Adamson testified that he input the coefficient of friction into the simulation that he obtained using a study done by Peter Cenek entitled, "Frictional Characteristics of Roadside Grass Types"[15] Mr. Adamson testified that the study determined that clover on the shoulder contributes to a vehicle's drifting and loss of control. Mr. Adamson testified that the study concluded that the possible use of white clover for a shoulder would significantly worsen the use of "an existing accepted hazard," (using rye grass or some other type of grass for a shoulder is an "accepted hazard"). Mr. Adamson further testified that a driver running off the road onto asphalt or a paved shoulder would be able to steer better because the tire would be on a stickier surface due to the higher coefficient of friction. Mr. Adamson agreed that the clover was what caused Mr. Jones to be unable to steer. When asked if there was any scenario he could see where it would be helpful to have clover on the shoulder, Mr. Adamson responded "No."

Mr. Adamson testified that if the road had been maintained as it was designed and constructed as a paved shoulder, then the crash would not have occurred because the paved shoulder would have allowed Mr. Jones' car to better steer back onto the road. Mr. Adamson also testified that the vehicle's stability control system or traction control system could have contributed to what occurred because even if the driver was pressing on the brake, only one brake might actually be braking.

---

[15] The study also lists Neil J. Jamieson and Maurice W. McLarin as authors.

Mr. Adamson was asked about Mr. Frederic's testimony that his truck and the other two vehicles were travelling side-by-side at one point. Mr. Adamson testified that such an action was not physically possible and there was no physical evidence to indicate such. When DOTD's counsel asked Mr. Adamson if Mr. Jones' statement about the eye-to-eye contact between the drivers indicated an intentional action of Mr. Myer driving into Mr. Jones' lane, Mr. Adamson disagreed, stating that Mr. Myer could have been "drifting." According to Mr. Adamson, an asphalt shoulder would have allowed Mr. Jones to steer more and, therefore, steer back onto the roadway, even at a greater speed, thereby avoiding impact with the guardrail.

Dr. Paul Brian Wolshon, the Joneses' expert in highway design and construction and traffic engineering, testified that the road was designed and constructed with a paved surface shoulder to provide a crucially important area for stopping and safe travel and recovery for errant vehicles that departed the travel lanes. Dr. Wolshon testified that AASHTO policy was that the right and left shoulders should be paved on ramps near freeways and on roads with speeds over 40 mph.[16] According to Dr. Wolshon, the road and asphalt shoulder in this case constituted part of a standard design where, as in this case, there was a curved high-speed exit ramp onto an interstate freeway with a fixed object hazard such as a guardrail, and the paved shoulder was safe in that situation. Dr. Wolshon further

---

[16] Dr. Wolshon was referring to the Louisiana DOTD Minimum Design Guidelines that were dated March 26, 2017, but he testified that those 2017 design standards were effectively the same as those from the 1960s, when the road was designed. Dr. Wolshon also testified that the DOTD guidelines were very consistent with AASHTO guidelines and that both AASHTO and DOTD guidelines were used to design highways in Louisiana. Dr. Wolshon additionally referred to the 2011 edition of the AASHTO guidelines, which he testified was also very consistent with the 1960 version.

The AASHTO guide entitled, "A Policy on Geometric Design of Highways and Streets," set out the policy regarding highway shoulders and specifically stated that "[w]ell-designed and properly maintained shoulders are needed on rural highways with an appreciable volume of traffic, on freeways, and on some types of urban highways." The AASHTO guide listed twelve advantages for well-designed and maintained shoulders, including that "[s]pace is provided for evasive maneuvers to avoid potential crashes or reduce their severity."

testified that a shoulder and a guardrail are designed to work together. Dr. Wolshon explained that a guardrail is designed to be impacted head-on or with a "shallow glancing blow" and is not designed to be "forgiving" if hit sideways. According to Dr. Wolshon, "[I]f somebody drives off the road or loses control, the shoulder is there to give them somewhat of an ability to steer back to the road or not to hit that guardrail going sideways, but to hit it more in a head-on direction." Thus, Dr. Wolshon testified, "having a shoulder that is recoverable or traversable is critical in the vicinity of a guardrail."[17] Dr. Wolshon testified that a driver could maintain control "a lot easier" on a paved shoulder when compared to a grass shoulder and that pavement provided a smooth surface and an ability to brake with a higher coefficient of friction than grass. When Dr. Wolshon was asked if he could see any utility in having a paved shoulder covered in grass and clover, he stated that he could not and replied that it would "only make it adverse" for traffic safety and operations. Dr. Wolshon testified that in the right situation a turf shoulder was safe. Dr. Wolshon agreed with DOTD's counsel that there were thousands of miles of high-speed state highways with grass shoulders, but he distinguished them from the road in this case, which he described as "a freeway facility." He also agreed that it was reasonable to assume that at some point after the road was constructed, DOTD saw the grass growing on the shoulder.

DOTD also offered expert testimony at the trial. DOTD's expert witness, Dr. Gary Thomas, a certified professional civil engineer, was qualified as an expert in highway design, construction, maintenance, and traffic engineering. According to Dr. Thomas, turf shoulders were not inherently unsafe and they were very common in Louisiana. Dr. Thomas testified that there were many asphalt shoulders that had become turf shoulders, and the fact that the turf had overgrown

---

[17] Dr. Wolshon was referring to the "Roadside Design Guide," a national publication that DOTD used extensively.

the asphalt did not make them unreasonably dangerous. Dr. Thomas testified that the AASHTO guidelines in the Maintenance Manual for Roadways and Bridges were not violated by DOTD as to this shoulder because it still provided lateral support and the safety area still existed in that it was flat, traversable, and recoverable. Dr. Thomas testified that the AASHTO guidelines did not say that the shoulder had to be maintained as originally designed and constructed. Dr. Thomas agreed that he did not believe that DOTD violated any maintenance guidelines in the maintenance of the shoulder.

Dr. Thomas testified that the shoulder was not maintained as designed but it did not endanger the public. Dr. Thomas agreed that grass had a lower coefficient of friction than asphalt. Dr. Thomas further admitted that it would be easier for a driver to stop on a paved shoulder due to the coefficient of friction, but he added, "Grass versus asphalt shoulder, if you go off on it and don't brake and just come back on, there's really no difference." Dr. Thomas indicated that a "clover shoulder" was as forgiving as a paved shoulder in the context of hitting fixed objects and the shoulder's slope.

DOTD's other expert witness was Jeremy C. Hoffpauir, a licensed mechanical engineer and a certified accident reconstructionist, who was an expert in accident reconstruction. Mr. Hoffpauir initially testified that, based on photographs of the scene and his visits to the accident site, Mr. Jones' car was going 70 mph when it left the road and in the range of 50 to 55 mph when it hit the guardrail. However, he subsequently opined that Mr. Jones' speed was between 47 to 58 mph when he hit the guardrail. Mr. Hoffpauir testified that the reduction in speed between leaving the road until impact was due to braking. However, Mr. Hoffpauir was unable to determine whether the reduction in speed was due to Mr. Jones pressing the brake or the car's electronic stability control system. Either way, he testified, "there is some braking going on." He also noted that the grass

21

was torn in the tire marks left by Mr. Jones' car, indicating that there was "some sliding." Mr. Hoffpauir described the left side tire path from Mr. Jones' car as "furrowing," which he explained consisted of making a rut in the grass as opposed to leaving a tire mark on a smooth surface when the brakes were locked. He testified that furrowing would increase the drag factor or slow Mr. Jones' car down faster.

Mr. Hoffpauir was questioned about whether Mr. Jones and Mr. Myer could have passed Mr. Frederic at or near the gore travelling at 70 mph and still have control of their vehicles at or near where Mr. Frederic testified that Mr. Jones went off the road. He testified that they "definitely" could have. Mr. Hoffpauir testified that he believed the effective coefficient of friction on the shoulder on the day of the accident was within a range of .3 to .4 considering the furrowing and the body roll of Mr. Jones' car. He distinguished this shoulder from the clover field in the study Mr. Adamson used.

After thoroughly and carefully reviewing the record to determine whether the district court erred in finding that the jury verdict was absolutely factually unsupported and whether the evidence pointed so strongly and overwhelmingly in favor of DOTD that reasonable jurors could not find that DOTD was 20% at fault, we find that the district court erred in granting DOTD's motion for JNOV. In granting the motion for JNOV, the district court reasoned that by assessing 40% fault to each driver, the jury determined road rage was a factor, and therefore, DOTD did not owe a duty to a driver engaging in such conduct. However, the jury was charged that DOTD's duty encompassed the risk that a motorist might inadvertently stray onto the shoulder and that it had a duty to maintain the shoulder in such a condition that it did not represent an unreasonable risk of harm to motorists. See **Brooks**, 74 So.3d at 189. As such, its assessment that Mr. Jones was 40% at fault could represent a determination that Mr. Jones was careless as

22

opposed to being involved in a road rage incident, such that DOTD was not relieved of its duty under the circumstances of this case. See **Campbell**, 648 So.2d at 902; **McCain**, 971 So.2d at 331-32. Moreover, DOTD owes a duty not only to prudent and perhaps imprudent and inattentive drivers, but also to their passengers. **Molbert v. Toepfer**, 550 So.2d 183, 186 (La. 1989), citing **Burge v. City of Hammond**, 494 So.2d 539 (La. 1986), where the Louisiana Supreme Court reversed the lower court's holding that as a matter of law DOTD owed *"no* duty to an imprudent motorist under a comparative fault system." **Burge**, 494 So.2d at 539. Additionally, more than one party can contribute to the harm. See **McCain**, 971 So.2d at 331. At the trial, there was extensive, but conflicting testimony and evidence, that required the jury to weigh the testimony and evidence. As the supreme court said in **Eastman**, "This alone means that triers of fact could have reached a different, but still reasonable conclusion." **Eastman**, 384 So.3d at 875.

At trial, Mr. Jones, Mrs. Jones, and Mr. Myer testified that there was no prior interaction between them before the accident and that they were not exceeding the speed limit. While Mr. Frederic indicated that Mr. Jones and Mr. Myer had a prior encounter at the gore and that they were racing each other, he could not testify as to any behavior indicating road rage, such as hollering or shaking of fists. The state trooper investigating the accident testified that Mr. Frederic did not include any information about racing or high speed in his statement about the accident. At trial, Mr. Frederic testified that he was "guesstimating" as to what speed Mr. Jones and Mr. Myer were driving and his testimony about their speeds was inconsistent. Moreover, Mr. Frederic testified that he faulted Mr. Jones for not slowing down to let Mr. Myer in as opposed to steering onto the shoulder.

The jury was instructed that it did not have to accept all the testimony of a witness as being true or false, but it could accept and believe those parts of the

23

testimony that it considered logical and reasonable and choose not to believe those parts that seems impossible or unlikely. See **Johnson**, 275 So.2d at 898. The jury could have easily dismissed Mr. Frederic's claim of road rage, yet at the same time believed Mr. Frederic's testimony that when Mr. Myer entered Mr. Jones' lane, Mr. Jones should have slowed down. The jury could have also faulted Mr. Jones for driving onto the shoulder instead of slowing or allowing Mr. Myer to hit Mr. Jones' car. It is also possible the jury could have faulted Mr. Jones for speeding or driving recklessly and inattentively, but still have determined that DOTD had a duty to provide a safe shoulder.

The jury was presented with evidence that the shoulder in this case posed an unreasonable risk of harm. Whether an unreasonably dangerous condition existed is measured by a "risk-utility" test, which relevant factors are: (1) the utility of the complained-of-condition; (2) the likelihood and magnitude of harm, including the obviousness and apparentness of the condition; (3) the cost of preventing the harm; and (4) the nature of the plaintiff's activities in terms of social utility or whether it is dangerous by nature. **Johnson**, 275 So.3d at 895.

In considering the trial testimony and evidence in light of the risk-utility test, the Joneses demonstrated that the presence of clover, grass, and dirt on the shoulder was not useful. Mr. Adamson testified that if the shoulder had been maintained as designed and constructed, Mr. Jones would have been able to steer back onto the road and avoid hitting the guardrail. Mr. Adamson indicated that there was no scenario he could see where the clover on the shoulder would be helpful. Dr. Wolshon also testified that he could not think of any utility for a paved shoulder to be covered in grass and clover and added that it would "only make it adverse" for traffic safety and operations. Mr. Adamson testified about a study which showed that using clover for roadside shoulders makes an already hazardous situation significantly more hazardous. The testimony of Mr. Adamson

24

and Dr. Wolshon demonstrated that asphalt was more useful than the clover, grass, and dirt because a driver would have better traction on asphalt due to the higher coefficient of friction. DOTD's expert, Mr. Hoffpauir, conceded that the coefficient of friction of a grass, clover, and dirt shoulder was between .3 to .4, nearly half that of asphalt.

Insofar as the likelihood and magnitude of the harm from the clover, grass, and dirt on the shoulder, while the witnesses could not testify as to other accidents, the injuries to Caleb in this case were extremely severe, resulting in a jury verdict totaling $20,000,000.00. Several witnesses acknowledged that drivers commonly leave roads. When asked by counsel if "[it] would be needlessly endangering the motoring public if you didn't preserve the safest possible as-designed shoulder," DOTD's representative, Mr. Palermo, replied affirmatively. Mr. Palermo further testifed about the procedure for removing the clover, grass, and dirt from this shoulder, which he estimated could take four hours with a motor grader to "blade" the material, which would then be hauled off, and which he thought would cost between $1,600.00 and $1,700.00. The last factor in the risk-utility test is the nature of the plaintiff's activities in terms of social utility or whether it is dangerous by nature. While Caleb's activity as a guest passenger had no social utility, it was not dangerous by nature.

The district court erred in determining that reasonable jurors could not conclude that DOTD was 20% at fault as the testimony and evidence showed that the left inside shoulder in this case was unreasonably dangerous to the guest passenger in a car that went off the road onto the shoulder when an SUV unexpectedly came into the car's lane.[18] The shoulder was designed to be made of asphalt on this interstate ramp where there were curves, a guardrail, and changes

[18] Our conclusion concerning the reasonableness of the jury's finding that the left shoulder was unreasonably dangerous is limited to the unique facts of this case.

25

from a single lane to two lanes. The shoulder was constructed of asphalt as designed; however, at the time of the accident, the asphalt was covered with clover, grass, and dirt that made the shoulder more slippery, such that the vehicle after it left the road could not be steered or braked and ultimately collided with a guardrail. We also note that this section of the road was somewhat complicated in that it involved a motorist being in a specific lane to travel to a certain designation, that is, the left lane for travel to the port of Baton Rouge, such that any inattention or careless driving could result in a motorist making a split-second decision to change lanes without ascertaining that the lane was clear. After reviewing the testimony and evidence, we conclude that the district court erred in reweighing the evidence and giving more credibility to certain witnesses. As the jury was instructed in this case, in assessing the credibility of the witnesses, it could accept or reject in whole or in part the testimony of any witness. See **Johnson**, 275 So.3d at 898. Therefore, we find that the Joneses' assignment of error has merit and that district court erred in granting the motion for JNOV and reallocating the fault the jury assessed.

In their second assignment of error, the Joneses contend that the district court erred in assessing any fault to Mr. Jones. Based on our review of the testimony and evidence, we find no manifest error in the jury's determination. Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. See **Stobart v. State, through Department of Transportation and Development**, 617 So.2d 880, 883 (La. 1993). A motorist owes a legal duty to use reasonable care in the operation and control of his vehicle. See La. 32:58; **Johnson**, 275 So.3d at 904. A motorist's duty of reasonable care includes the duty to keep his vehicle under control and to maintain a proper lookout for hazards. **Johnson**, 275 So.3d at 904. In this case, the jury recognized Mr. Jones' duty and allocated a percentage of fault

to him, which is supported by the testimony and evidence as to Mr. Jones' driving before the accident. Therefore, we find that the Joneses' assignment of error as to Mr. Jones' comparative fault has no merit.

## CONCLUSION

We find that the district court erred in granting the motion for JNOV filed by the State of Louisiana, through Department of Transportation and Development, and we reverse the March 13, 2023 judgment of the district court granting the motion for JNOV. The original judgment dated December 12, 2022, incorporating the jury verdict is hereby reinstated. Costs of this appeal in the amount of $18,920.50 are to be paid half by DOTD in the amount of $9,460.25 and half by Jason and Stephanie Jones in the amount of $9,460.25.

**REVERSED; JURY VERDICT REINSTATED; JUDGMENT OF DECEMBER 12, 2022 REINSTATED.**